UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


D&S MARINE SERVICES, LLC                              CIVIL ACTION


VERSUS                                               NO. 11-508


LYLE PROPERTIES, LLC                                 SECTION "H" (2)


FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was tried before the Court, sitting without a jury, on November 5, 2012.  The Court had previously granted judgment in favor of D&S Marine Services, LLC ("D&S") and against Lyle Properties, LLC ("Lyle") in the amount of two hundred forty-seven thousand, six hundred and seventy-four dollars and fort cents ($247,674.40) with one and a half percent (1.5%) interest per month on March 20, 2012.  (Doc. 64; *see also* Doc. 65.)  Thus, only Defendant Lyle's claims against Third Party Defendant, Lawson Environmental Services, LLC ("Lawson") remained before the Court.

Having considered the testimony and evidence at trial, the arguments of counsel, and the

-1-

applicable law, the Court now issues the following Findings of Fact and Conclusions of Law in
accordance with Federal Rule of Civil Procedure 52(a).

**FINDINGS OF FACT**

*UNCONTESTED FACTS*

1.     Lawson is a limited liability company with its principle place of business located in Houma,
       Terrebonne Parish, Louisiana; its officer and member, Cecil B. Lawson ("Cecil") is the
       principal of Lawson authorized to contract all business on its behalf.

2.     Lyle is a limited liability company with a principle place of business located in Chauvin,
       Terrebonne Parish, Louisiana; Jason Lyle ("Jason") is its manager-member authorized to
       contract all business on its behalf.

3.     Jason, on behalf of Lyle, contracted with Cecil, on behalf of Lawson, to provide various
       equipment, supplies, and services in the aftermath of the blowout on the *Deepwater
       Horizon* in April 2010.  Lyle entered into multiple contracts with Lawson for this project ("BP
       Project"), one of which was a Master Time Charter Agreement for the M/V DUSTIN D.

4.      Lyle entered into a substantially similar Master Time Charter Agreement with D&S for the
       M/V DUSTIN D.  The only difference in the Lyle-D&S Agreement and the Lyle-Lawson
       Agreement was for the payment price per day.  Specifically, Lyle paid $4,200.00 to D&S for
       the M/V DUSTIN D and Lawson paid Lyle $4,800.00 per day for the M/V DUSTIN D.

5.      Lyle would invoice Lawson for the days worked by the M/V DUSTIN D, including sales tax. The invoices for days worked were included on Lyle's vendor ledger numbers: 450, 466, 496, 511, 532, 541, 547.

6.      Subsequent to Lyle invoicing Lawson, Lawson would add its profit margin, invoice BP Exploration and Production ("BP"), with whom Lawson had a separate contract with, and then Lawson would pay Lyle.

7.      BP audited Lawson in connection with the M/V DUSTIN D and advised that sales tax should not have been charged and demanded that it be refunded.

8.      Lyle terminated the services of the M/V DUSTIN D after seventy-five (75) days of service.

9.      A settlement agreement was entered into between Lyle and Lawson on December 16, 2010.

10.     In the settlement agreement, Lyle agreed to accept as a final payment, for its statement dated December 17, 2010, a total of $153,680.44.

11.     Lawson paid Lyle the $153,680.44 to Lyle per the settlement agreement.

12.     Lawson was not paid for any amounts under the Lawson-BP contract after BP terminated the services for which the M/V DUSTIN D was needed.

*MASTER TIME CHARTER AGREEMENT*

13.     The Master Time Charter Agreement ("Charter") and the attached letter agreement constituted the entire agreement between Lawson and Lyle.

14.     The Charter was a valid and binding contract executed by Cecil and Jason executed on July 12, 2010.

15.     The term of the Charter was from July 12, 2010 to January 12, 2011 at a rate of four thousand eight hundred dollars per day ($4,800.00).

16.     Lawson rented the M/V DUSTIN D and paid under the Charter for the dates of July 12 through 26, 2010 and August 7 through October 3, 2010.  D&S invoiced Lyle and was paid for all of these dates.

17.     On October 2, 2010 BP informed Lawson that the services that were being performed by the M/V DUSTIN D were no longer required.

18.     On October 4, 2010 Lyle returned the M/V DUSTIN D to D&S.

19.     Lawson made no payment to Lyle after October 3, 2010.

20.     The Charter states that "[n]o changes, amendments, or variations of the terms and conditions shall be valid or binding on the parties hereto in any respect unless made in writing and signed by both parties hereto."

21.     There were no changes, amendments or variations of the terms made in writing and signed by the parties.

22.     The Charter states that it "[m]ay be terminated by either party on ninety (90) day notice delivered in writing; provided, however, that such cancellation shall not be effective as to any vessel which has been delivered to CHARTERER [Lawson] under the terms hereof until

the Charter terms stipulated in such vessel's letter agreement has expired and such vessel

is redelivered."

23.    There was no ninety day notice delivered in writing by Lawson.

24.    The Charter contains indemnity provisions in paragraphs XIII and XV.

25.    The Charter states in Paragraph XV:

Neither CHARTERER [Lawson], its subsidiary and affiliated companies, nor their respective officers, directors, members, employees and underwriters (hereinafter "the CHARTERER Indemnitees") shall have any liability for damage to or loss of the vessel or its equipment, or the property or equipment of OWNER [Lyle] or of the owners and/or operators of the brokered vessels, or for injury to, illness of or death of the crew of the vessel, employees of the OWNER [Lyle] or of the owners and/or operators of brokered vessels, their respective contractors or subcontractors or their respective employees, however said damage, loss, injury, illness or death arises or occurs, whether, in whole or in part, through the negligence of the CHARTERER Indemnitees or otherwise.  OWNER [Lyle] (solely with respect to the charter of OWNER [Lyle] vessels) and the owners and/or operators of brokered vessels (solely with respect to the charter of brokered vessels) agrees to release, protect, defend, indemnify and hold harmless the CHARTERER Indemnitees from and against any claim, suit, loss, liability, expense, demand, cost or damage as a result of such loss, damage, injury, illness or death regardless of whether the damage is caused, in whole or in part, by the negligence of the Charterer Indemnitees or the unseaworthiness of any vessel or barge. . .

Notwithstanding anything to the contrary contained herein, it is expressly agreed by and between the parties hereto that, regardless of the negligence on the part of any party hereto or the unseaworthiness (pre-existing or not) of any vessel, or any charter breach, CHARTERER [Lawson] waives and releases any and all rights against the Vessel Indemnitees, and OWNER [Lyle] and the owners and/or operators of brokered vessels waive and release any and all rights against the CHARTERER [Lawson] Indemnitees, for any punitive, indirect, incidental, special or consequential damages of any kind or nature (including, but not limited to, loss of profits, loss of use, loss of hire or loss of production).

26.    There was no damage or loss of the M/V DUSTIN D or its equipment, or the property or

equipment of Lyle.

27.   There were no injuries, illnesses or deaths of the crew of the vessel, employees of Lyle or

of the owners and/or operators of brokered vessels, their respective contractors or

subcontractors or their respective employees.

28.   There was no negligence on the part of any party or an unseaworthy vessel.

29.   The purpose of the contract was to lease to Lawson a vessel so that Lawson could utilize the

M/V DUSTIN D for the use of Lawson's separate contract with BP.

30.   The Charter indicates the clear intent of the parties that the lease would be for the certain

amount of time - one hundred eighty four (184) days.

31.   The argument that the parties contracted without a remedy for a breach of the Charter is

not credible.

*SETTLEMENT AGREEMENT*

32.   Cecil and Jason negotiated the settlement agreement with Janet Lyle present.

33.   The Settlement Agreement states that it is an agreement "to settle their accounts for all

work/materials at the Pointe Aux Chenes work site in the following manner: . . . Lyle

Properties LLC Statement dated 12/17/10: Lyle Properties has agreed to a total of

$153,680.44 as final payment."

34.   The plain terms of the settlement agreement are ambiguous.

35.   The Settlement Agreement does not reference the M/V DUSTIN D.

36.    The M/V DUSTIN D was no longer at the Pointe Aux Chenes worksite at the time of the settlement agreement.

37.    The Settlement Agreement does not reference the Lyle-Lawson Charter.

38.    The Settlement Agreement does not reference BP or BP Project.

39.    The Settlement Agreement has attached invoices referencing the line items settled by the $153,680.44.

40.    The testimony of Jason Lyle and Janet Lyle is credible in that they credited Lawson for sales taxes that it had been paid but should not have been charged.

41.    The purpose of the Settlement Agreement was to settle the Lawson-Lyle accounts for work and materials at the Pointe Aux Chenes worksite, not for the settlement of the accounts relating to the M/V DUSTIN D or the Lyle-Lawson Charter.

*LIABILITY*

42.    Under the Charter, Lawson is liable to Lyle for its early termination of the contract.

43.    The amount that Lawson owes Lyle is determinable as follows:

   a.    Daily Charter Rate ($4,800.00) x Days (184) = $883,200.00

   b.    The M/V DUSTIN D was sold on December 20, 2011 - twenty three (23) days prior to the expiration of the Time Charter.  Thus, $110,400.00 is subtracted from $883,200.00.

   c.    D&S mitigated its damages from the breach of the Lyle-D&S Charter.  Thus, D&S

earned $76,088.00 in substitute charters and $45,837.60 for crew expenses saved. These savings can be deducted from the amount that Lawson owes Lyle.  Thus, $121,925.60 is subtracted from $883,200.00.

d.  Lawson had previously paid Lyle $340,200.00 to Lyle.  Thus, $340,200.00 is subtracted from $883,200.00.

e.  Based on these calculations Lawson owes to Lyle a total of $310,674.40.

## CONCLUSIONS OF LAW

1.  The Charter identifies that it shall be construed in accordance with the admiralty and maritime laws of the United States of America.

### *MASTER TIME CHARTER AGREEMENT*

2.  The Charter with the attached letter agreement "together create a maritime time charter contract" which is governed by federal law.  *Cashman Equip. Corp. v. M/V Godfather*, No. 05-6271, 2007 WL 934537, at *2 (E.D. La., Mar. 23, 2007) (citing *Randall v. Chevron*, 13 F.3d 888 (5th Cir. 1994)).

3.  When interpreting a maritime contract, the general rules of contract construction interpretation apply.  *See Marine Overseas Services, Inc. v. Crossocean Shipping Co.*, 791 F.2d 1227, 1234 (5th Cir. 1986).

4.  Maritime law is clear in that if the contract is unambiguous, the contract must be enforced

according to its plain meaning, and the court need not go beyond the four corners of the contract.  *See Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332-333 (5th Cir. 1981).

5.      The plain language of the contract is the best measure of the parties' intent.  *See Reliant Energy Services, Inc. v. Enron Can. Corp.*, 349 F.3d 816, 822 (5th Cir. 2003).

6.      "A contract is ambiguous only if its terms are unclear or susceptible to more than one reasonable interpretation, or the intent of the parties cannot be ascertained from the language employed."  *Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 517 (5th Cir. 2010).

7.      The Charter is clear and unambiguous on its face that Lyle was to lease to Lawson for one hundred and eight four (184) days the M/V DUSTIN D at a rate of four thousand eight hundred dollars ($4,800.00) per day.

8.      The return of the vessel on October 4, 2010 is a modification or termination of the Charter, as the terms of the Charter clearly indicate that the charter for the M/V DUSTIN D was not to end until January 12, 2011.

9.      A modification or termination under the specific terms of the Charter did not occur, thereby making Lawson in breach of contract as of October 4, 2010 when it discontinued payment to Lyle.

10.     The indemnity provisions found in paragraph XV of the Charter are not applicable because the triggering events for those provisions never took place.

*SETTLEMENT AGREEMENT*

11.     Settlement agreements are treated like any other contract and it must be interpreted pursuant to general contract principles.  *See Hassinger v. JP Morgan Chase & Co.*, 394 Fed.Appx. 63, 65 (5th Cir. 2010).

12.     "The contract should be read as a whole, and a court should not look beyond the written language of the contract to determine the intent of the parties unless the disputed language is ambiguous." *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1086) (discussing general contract principles on the context of a maritime contract).

13.     If a contract is ambiguous then the Court may examine extrinsic evidence to determine the intent of the parties.  *See KAI Enterprises, LLC v. Boh Bros. Const. Co., LLC*, 731 F.Supp.2d 568, 574 (E.D. La. 2010).

14.     The Settlement Agreement executed between Cecil and Jason was ambiguous and thus a review of extrinsic evidence was necessary to determine the intent of the parties.

*DAMAGES*

15.     "A vessel owner is required to mitigate damages and may not recover damages for losses resulting from the owner's failure to use reasonable measures to halt the progress of damage." *Delta Steamship Lines, Inc. v. Acondale Shipyards, Inc.*, 747 F.2d 995, 1003 n. 23 (5th Cir. 1984).

16.     "The shipowner is entitled to the net amount that would have been earned under the charter sued on, less the net amount actually earned, or which might, with reasonable

diligence, have been earned, by the vessel during the time required for the voyage named in such contract of charter." *Ainesworth Coal & Iron Co. v. Trafikaktiedolaget Grangesberg Oxelosound*, 287 F.291, 296 (4th Cir. 1923).

## CONCLUSION

Based on the above findings of fact and conclusions of law, the Court finds that Lawson Environmental Services, LLC breached their Master Time Charter Agreement dated July 20, 2010 with Lyle Properties, LLC.  After making the appropriate deductions it is the judgment of this Court that Third Party Defendant Lawson Environmental Services, LLC owes Defendant Lyle Properties, LLC $310,674.40 for its breach.

New Orleans, Louisiana on this 27th day of November, 2012.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT COURT JUDGE**